**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

**JONI W.,**

                **Plaintiff,**

    **v.**                          **Civil Action 2:23-cv-2505**
                                        **Magistrate Judge Kimberly A. Jolson**

**COMMISSIONER OF**
**SOCIAL SECURITY,**

                **Defendant.**

## OPINION AND ORDER

Plaintiff, Joni W., brings this action under 42 U.S.C. § 405(g) seeking review of a final decision of the Commissioner of Social Security ("Commissioner") denying her applications for Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI"). For the reasons set forth below, the Court **OVERRULES** Plaintiff's Statement of Errors (Doc. 10) and **AFFIRMS** the Commissioner's decision.

## I.    BACKGROUND

Plaintiff previously applied for DIB and SSI on June 7, 2012. Her applications proceeded to an administrative hearing, and ALJ Dawn Gruenburg issued an unfavorable decision on January 29, 2014. (R. at 15, 91–111).

Plaintiff protectively filed her current applications for DIB on June 12, 2020, and for SSI on October 13, 2020, alleging disability beginning July 29, 2019,[1] due to major depression, borderline personality disorder, fibromyalgia, high blood pressure, chronic pain, arthritis, high cholesterol, anxiety, and prediabetes. (R. at 278–92, 317). After her applications were denied

---

[1] ALJ Stanley noted he was considering the evidence from January 30, 2014, one day after the prior Unfavorable Decision, forward. (R. at 15–16).

initially and on reconsideration, Administrative Law Judge William Stanley ("ALJ Stanley") held a telephone hearing on June 9, 2022.  (R. at 43–90).  ALJ Stanley denied benefits in a written decision on July 6, 2022.  (R. at 12–42).  The Appeals Council also denied Plaintiff's request for review, making his decision the final decision of the Commissioner.  (R. at 1–6).

Plaintiff filed the instant case seeking a review of the Commissioner's decision on August 3, 2023 (Doc. 1), and the Commissioner filed the administrative record on September 27, 2023 (Doc. 7).  The matter has been briefed and is ripe for consideration.  (Docs. 10, 12, 13).

### A.    Relevant Statements to the Agency and Hearing Testimony

The ALJ summarized Plaintiff's statements to the agency and at her hearing as follows:

***[Plaintiff] submitted a Function Report wherein she alleges difficulties lifting, squatting, bending, standing, reaching, walking, sitting, kneeling, stair climbing, seeing, remembering, completing tasks, concentrating, understanding, following instructions, and getting along with others (Exhibit B8E).

*** [Plaintiff] testified that she lives in a home. She endorsed difficulties with stairs and stated that she sometimes loses her balance and has to hold on to a railing. She lives with her husband [ ], son, and daughter. She has a driver's license and drives 3-4 times a week to the store. She endorsed having a high school education with some college classes. She obtained a GED and a nurse's aide certification.

When questioned about her mental health, she endorsed frequent break downs when she is not able to function, occurring 2-4 times a week. She stated that they are like panic attacks with shaking and jitteriness, during which time she needs to be alone. She endorsed good days and bad days. During a good day, she is able to tidy up around the house, manage the bills, and help others around the house. She stated that even on good days, she takes frequent breaks due to pain and leg pain. During bad days, she stated that she does not talk to others and mostly spends time in her room. She stated that she hears voices a couple of times a month. She endorsed bad days occurring 3-4 days a week during which time her husband helps her with self-care. She stated that she gets 8 hours of sleep, but that she wakes up a lot during the night and she requires 2-3 hour naps during the day. She endorsed pain in her hips and headaches, for which she takes over the counter pain medications and uses ice. Due to a combination of her conditions, [Plaintiff] stated that she is limited to standing for 5-10 minutes, is limited to walking for 5-10 minutes, and is limited to sitting for 15 minutes at a time.

(R. at 25).

**B.      Relevant Medical Evidence**

The ALJ summarized the medical records as to Plaintiff's physical impairments as follows:

*** [T]he current record now supports an assessment and treatment for diabetes mellitus, type II. While she reports some elevated blood sugar levels, they are not extremely elevated (often reported at in the 100s), she does not require treatment with insulin, and she has no associated physical examination abnormalities. Her diabetes mellitus is treated with oral medication and is noted to be without complication. Indeed, repeated diabetes mellitus follow up examinations with her primary care physician show normal foot examinations, with intact sensations and normal monofilament testing. She has not required specialty care and she has not required any emergency room visits or inpatient care related to any diabetic symptom. (Exhibits B16F, B18F, B19F, and B22F). In March 2021, she reported having diabetes mellitus for five years with no associated retinopathy or nephropathy and no related hospitalizations (Exhibit B18F). In July 2021, her reported A1C and blood sugars were only slightly elevated at 7.7 and 150-180, respectively. A detailed diabetes mellitus follow-up physical examination showed entirely normal findings, with a normal gait, intact strength, intact sensations, and a normal foot examination with no open areas or tingling. (Exhibit B22F/57).

***

Since the prior Unfavorable Decision, [Plaintiff] has also reported some low back pain with radiation through her leg. She reports a history of spinal fusion and back pain "for as long as [she] can remember." (Exhibit B18F/2). During the internal medicine consultative examination performed in March 2021, she exhibited tenderness to the paraspinal muscles and reported pain with range of motion, but she had a normal gait, intact strength, negative straight leg rises (Exhibit B18F). She was assessed with lumbar radiculopathy in May 2021 due to reports of back pain radiation through her lower extremities. However, at that time, a full and detailed physical examination showed entirely normal musculoskeletal and neurological findings, with [Plaintiff] having a normal gait, intact strength, and a full range of motion (Exhibit B22F/68). She was sent for imaging and x-rays of her lumbar spine, as well as, an EMG of [Plaintiff]'s lower extremities, were unremarkable, showing no significant lumbar findings and no evidence of radiculopathy, myopathy, or neuropathy (Exhibit B23F/8 and B23F/11).

***

In July 2014, [Plaintiff] was treated for an acute onset of vertigo on an outpatient basis in the emergency room. A physical examination was normal, and she was prescribed Valium. (Exhibit B4F). In May 2017, she was treated in the emergency room on an outpatient basis for dizziness (Exhibit B8F). . . . While this is a new assessment, it has only received acute care on two occasions, with no evidence of any reoccurrence.

3

With regard to the remainder of [Plaintiff]'s severe physical conditions, including asthma, fibromyalgia, and hypertension, these conditions have received only routine care. They are well managed with oral medications with no evidence of any disabling physical examination abnormalities related thereto. There is no evidence of any new or abnormal respiratory imaging studies, no evidence of any specialty pulmonary care, and physical examination show normal lung sounds throughout the relevant time period. Her hypertension is well managed with oral medications with no evidence of any emergency room visits, inpatient care, or specialty cardiac care. (Exhibits B9F, B16F, B18F, and B19F). ***

With regard to her fibromyalgia, it was noted in September 2016, that she had not taken any medications for eight years. At that time, she reported pain everywhere in her muscles and she was prescribed Lyrica (Exhibit B9F/25). However, it should be noted that at that time a full and detailed physical examination was entirely normal, showing [Plaintiff] to be alert, fully oriented, and well appearing, with normal speech, normal cognitive functioning, normal gait and stance, normal strength, intact sensations, no edema, normal mood, and no mention of any fibromyalgia tender points (Exhibit B9F/25). In May 2017, it was noted that she was now taking Norco for fibromyalgia, and she was requesting an increase in her dosage. However, again, a physical examination was entirely normal, showing intact gait, intact strength, intact sensations, and no mention of any fibromyalgia tender points (Exhibit B9F/9). During the internal medicine consultative examination in March 2021, [Plaintiff] reported a history of fibromyalgia and complained of muscle and joint pain overall. She also reported fatigue and feeling tired all the time. However, the consultative examination was mostly normal. She had some mild bony enlargement of the first MTP joint of each foot and mild hallus valgus deformity bilaterally, but 5/5 grip strength, 5/5 upper and lower extremity strength, a normal gait, intact reflexes, intact sensations, intact cranial nerves, and no mention of any fibromyalgia tender points. (Exhibit B18F/4).

***

The undersigned has also considered [Plaintiff]'s body habitus and its effect in causing or contributing to [Plaintiff]'s other impairments. The evidence reflects that [Plaintiff] is 5'3" and weighs approximately 228 pounds, giving her a body mass index (BMI) of 41 (Exhibits B18F and B22F).

(R. at 26–28).

The ALJ summarized records concerning Plaintiff's mental impairments as follows:

Turning to [Plaintiff]'s mental condition, the current record continues to support assessments and treatment for anxiety, depression, borderline personality disorder, and PTSD. She had some slight worsening of her overall mental health, resulting in one short hospitalization in November 2021, due to suicidal ideation and

4

increased depression. However, otherwise, her treatment has continued to be to routine medication management and counseling, with evidence of symptoms that wax and wane mostly due to financial stressors.

In February 2015, the record indicates that [Plaintiff] was attending college classes and working eight hours a week (Exhibit B6F/7). In June 2015, she reported being more stressed at home, but her symptoms were "stable" (Exhibit B6F/4). She was discharged from mental health services in August 2015, as she made progress, was able to regular her emotions better, and was attending college and caring for her children (Exhibit B6F/2).

In August 2016, it was noted that [Plaintiff] preferred not to take any medications and has been "very active" (Exhibit B9F/27). In May 2017, her depression was noted to be well controlled with oral medication (Exhibit B9F/10). In September 2017, a mental status examination showed [Plaintiff] to be normal, with euthymic mood, normal affect, intact thought processes and thought content, and no suicidal ideation (Exhibit B10F/38).

Subsequently, she returned to counseling in October 2018 and remained on medication management. She reported increased symptoms with stressors, including work, finances, and her husband health. However, mental status examinations frequently showed [Plaintiff] to have a depressed mood and constrictive affect. She also reported poor impulse control and some passive suicidal ideation, but she was otherwise, well groomed, with normal speech, good attention, intact thought processes, good eye contact, normal thought content, and normal psychomotor movements. (Exhibit B12F). She reported a "history of auditory hallucinations of persecutory nature" but she did not appear to be responding to internal stimuli (Exhibit B12F/12). In October 2020, her anxiety was noted to be well controlled. (Exhibit B12F/6).

In March 2021, [Plaintiff] reported only mild to moderate mental symptoms and reported an improvement in her overall symptoms after receiving stimulus money allowing for repairs to her home and a computer. She reported some anxiety in crowds, but denied suicidal ideation. She reports thoughts of self-harm when stress, but denied any cutting. (Exhibit B19F). In August 2021, [Plaintiff] reported an improved mood, and it was noted that she was working for a call center (Exhibit B22F/51). In October 2021, she reported that she got a job and did well, but was later laid off (Exhibit B22F/45). She was noted to have some superficial cuts, but she reported no active suicidal ideation. Her medication was increased to help with impulsivity (Exhibit B22F/45).

She was hospitalized for five days in November 2021, for suicidal ideation and increased depression. At that time, she endorsed increased stressors including being denied disability, limited financial resources, and her husband having medical problems and also being denied for disability. However, with appropriate treatment, her mood improved and stabilized, and her depression "resolved" (Exhibit B21F/2).

5

Upon discharge it was noted that she is capable of her own activities of daily living with a fair prognosis.

Subsequently, she returned to counseling and medication management with evidence of stabilization/improvement in her symptoms. In December 2021, she was "doing ok" (Exhibit B22F/22). In February 2022, she reported that she was "feeling better now." (Exhibit B22F/10). Her only concern was anticipatory anxiety about her disability hearing. She was in a better mood with no nightmares, flashbacks, or hallucinations since discharge (Exhibit B22F/10). In March 2022, it was noted that she was trying to improve her health and wellbeing. She had lost 12 pounds and denied medication side effects, self-harm, and psychosis (Exhibit B22F/7). It was specifically noted that she was "managing her health and participating in treatment." (Exhibit B22F/7). A full and detailed mental status examination showed [Plaintiff] to have a flat affect and fair attention and concentration, but she had good impulse control,  good insight, adequate judgment, normal speech, normal thoughts, normal motor activity, normal cognitive functioning, normal insight (Exhibit B22F). Later that same month, she reported increased stress due to finances with passive suicidal ideation, but she denied any cutting or desire to cut. Most recently, in May 2022, she reported feeling ok, just anxious about her disability hearing. She was "doing well" and a mental status consultative examination with normal (Exhibit B23F/1).

(R. at 29–30).

## C.    The ALJ's Decision

ALJ Stanley found that Plaintiff meets the insured status requirements through September 30, 2019, and deferred a determination as to whether Plaintiff has engaged in substantial gainful activity since January 30, 2014.  (R. at 18).  He concluded that Plaintiff suffers from severe impairments of asthma; obesity; fibromyalgia; hypertension, vertigo; lumbar radiculopathy; history of spinal fusion; diabetes mellitus type II; borderline personality disorder; anxiety disorder; depressive disorder; and posttraumatic stress disorder.  (R. at 19).  Still, ALJ Stanley found that none of Plaintiff's impairments, either singly or in combination, meets or medically equals a listed impairment.  (*Id.*).  Upon "careful consideration of the evidence," he concluded that Plaintiff's "statements concerning the intensity, persistence and limiting effects of [her] symptoms are not entirely consistent with the medical evidence and other evidence in the record[.]"  (R. at 25).

6

As to Plaintiff's residual functional capacity ("RFC"), ALJ Stanley stated:

[Plaintiff] has the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) and 416.967(b) except with the following limitations: can occasionally climb, stoop, kneel, crouch, and crawl; must avoid concentrated exposure to extreme cold and irritants, such as concentrated fumes, odors, dust, gases, and poor ventilation; must be allowed to alternate sitting and standing at will; limited to simple, routine, and repetitive tasks, requiring only simple decisions, with no fast-paced production requirements, such as assembly line work or piecemeal quotas; capable of adapting to changes in the work environment, meaning changes in work responsibilities or workplace, which are explained in advance of implementation and implemented gradually over time; can have occasional contact with coworkers and supervisors; can have no contact with the general public; and once work is assigned, it should be able to be performed without working in close coordination with others and generally, tasks should be require working with things rather than people.

(R. at 24).

Relying on the vocational expert ("VE")'s testimony, the ALJ concluded that Plaintiff is unable to perform her past relevant work as a housekeeper/cleaner; a composite job of oiler; a security job; a composition job of laundry manager/laundry worker; and a receiver-dispatcher. (R. at 31–32). ALJ Stanley then determined that Plaintiff would be able to perform the requirements of representative occupations in the national economy such as a linen grader, marker, or addresser. (R. at 32–33). He concluded that Plaintiff has not been disabled within the meaning of the Social Security Act since January 30, 2014. (R. at 33).

## II.    STANDARD OF REVIEW

The Court's review "is limited to determining whether the Commissioner's decision is supported by substantial evidence and was made pursuant to proper legal standards." *Winn v. Comm'r of Soc. Sec.*, 615 F. App'x 315, 320 (6th Cir. 2015); *see also* 42 U.S.C. § 405(g). "[S]ubstantial evidence is defined as 'more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to

support a conclusion.'" *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007) (quoting *Cutlip v. Sec'y of HHS*, 25 F.3d 284, 286 (6th Cir. 1994)).

"After the Appeals Council reviews the ALJ's decision, the determination of the council becomes the final decision of the Secretary and is subject to review by this Court." *Olive v. Comm'r of Soc. Sec.*, No. 3:06-cv-1597, 2007 WL 5403416, at *2 (N.D. Ohio Sept. 19, 2007) (citing *Abbott v. Sullivan*, 905 F.2d 918, 922 (6th Cir. 1990); *Mullen v. Bowen*, 800 F.2d 535, 538 (6th Cir. 1986) (*en banc*)). If the Commissioner's decision is supported by substantial evidence, it must be affirmed, "even if a reviewing court would decide the matter differently." *Id.* (citing 42 U.S.C. § 405(g); *Kinsella v. Schweiker*, 708 F.2d 1058, 1059–60 (6th Cir. 1983)).

## III. DISCUSSION

On appeal, Plaintiff contends that ALJ Stanley failed to properly weigh the opinion of LISW Carolyn Martin and that he applied the wrong standard of review by adopting the prior findings of ALJ Gruenburg and the opinions of the state agency psychologists. (Doc. 10). The Commissioner counters that ALJ Stanley appropriately considered the medical opinions and prior administrative medical findings of record. (Doc. 12 at 4–9).

### A. Evaluation of Carolyn Martin's Opinion

The Undersigned first turns to ALJ Stanley's consideration of the opinion of Plaintiff's counselor, Carolyn Martin, LISW. ALJ Stanley found her opinion unpersuasive for the following reasons: "This source completed a check box form indicating that the claimant has marked and extreme mental limitations. Such a determination is inconsistent with the record, showing mostly moderate symptoms, which wax and wane. Moreover, this source provides inadequate support, with no written explanation or citation to objective evidence." (R. at 31, citing R. at 1166–71).

Plaintiff contends that ALJ Stanley erred in this evaluation. (Doc. 10 at 11–12). The Undersigned disagrees.

A claimant's RFC is an assessment of "the most [she] can still do despite [her] limitations." 20 C.F.R. § 404.1545(a)(1) (2012). A claimant's RFC assessment must be based on all the relevant evidence in his or her case file. *Id.* The governing regulations describe five different categories of evidence: (1) objective medical evidence, (2) medical opinions, (3) other medical evidence, (4) evidence from nonmedical sources, and (5) prior administrative medical findings.[2] 20 C.F.R. § 404.1513(a)(1)–(5). Regarding two of these categories—medical opinions and prior administrative findings—an ALJ is not required to "defer or give any specific evidentiary weight, including controlling weight, to any medical opinion(s) or prior administrative finding(s) including those from [Plaintiff]'s medical sources." 20 C.F.R. § 404.1520c(a). Instead, an ALJ must use the following factors when considering medical opinions or administrative findings: (1) "[s]upportability"; (2) "[c]onsistency"; (3) "[r]elationship with [Plaintiff]"; (4) "[s]pecialization"; and (5) other factors, such as "evidence showing a medical source has familiarity with the other evidence in the claim or an understanding of [the SSA's] disability programs policies and evidentiary requirements." 20 C.F.R. § 404.1520c(c)(1)–(5). Supportability and consistency are the most important of the five factors, and the ALJ must explain how they were considered.

---

[2] The regulations define prior administrative findings:

> A prior administrative finding is a finding, other than the ultimate determination about whether you are disabled, about a medical issue made by our Federal and State agency medical and psychological consultants at a prior level of review (see § 416.1400) in your current claim based on their review of the evidence in your case record . . .

20 C.F.R. § 404.1513(a)(2), (5).

20 C.F.R. § 404.1520c(b)(2).  At base, the role of the ALJ is to articulate how he considered medical opinions and how persuasive he found the medical opinions to be.  *Holston v. Saul*, No. 1:20-cv-1001, 2021 WL 1877173, at *11 (N.D. Ohio Apr. 20, 2021), *report and recommendation adopted*, No. 1:20 CV 1001, 2021 WL 1863256 (N.D. Ohio May 10, 2021).

As ALJ Stanley noted, Carolyn Martin's opinion took the form of a checklist where Ms. Martin marked Plaintiff's relevant symptoms and then rated her abilities and limitations.  (R. at 31 (describing Ms. Martin's opinion as a "check box form"), citing R. at 1166–71).  ALJ Stanley found her conclusion that Plaintiff has "marked and extreme limitations" "inconsistent with the record," which "show[s] mostly moderate symptoms, which wax and wane."  (*Id.*).  Then, he stated that Ms. Martin's opinion had "inadequate support," because she did not cite to "objective evidence" or provide "written explanation[s]" for her conclusions.  (*Id.*).  Accordingly, ALJ Stanley found her opinion "not persuasive."  (*Id.*).

Substantial evidence supports his assessment.  As ALJ Stanley discussed elsewhere in his opinion, Plaintiff's mental health treatment consisted of "routine medication management and counseling," except one hospitalization in late 2021.  (R. at 29); *see Hill v. Comm'r of Soc. Sec.*, 560 F. App'x 547, 551 (6th Cir. 2014) (stating an ALJ's decision must be read as a whole).  ALJ Stanley found that Plaintiff's symptoms worsened due to "financial stressors," as well as other events and conflicts in her life.  (R. at 29).  And indeed, her mental health symptoms appeared to "wax and wane."  (R. at 31).  For example, ALJ Stanley examined records from 2015 to 2017, which showed Plaintiff attending college, working full-time, and reporting improved mood and mental health symptoms that she "controlled with oral medication."  (R. at 29, citing R. at 602 (describing improvements in Plaintiff's mental health, including her ability to attend college and care for her children), 607 (noting that despite increased stress due to finances, work, and online

classes, Plaintiff is "coping with things better now"), 661 (discussing Plaintiff wishing to continue psychiatric medications and that her mental health appeared normal), 678–82 (noting Plaintiff's normal mental health functioning; 736 (same)). However, Plaintiff's mental health declined when she encountered stressors associated with work, finances, and her husband's health. (*Id.*, citing R. at 754, 759–60, 763, 765, 769, 773, 779, 781, 791, 793, 803, 806, 809, 812, 817, 822).

Again, Plaintiff's symptoms improved in 2020, and ALJ Stanley noted that her anxiety was "well controlled" during this time. (*Id.*, citing R. at 759 (discussing stressors in Plaintiff's life, as well as her ability to cope with them); *see also* R. at 765 (noting Plaintiff had not self-harmed in over eight years), 769 (discussing how Plaintiff feels less anxious when she is getting out of the house), 779 (discussing Plaintiff's ability to work some and recognize when coping skills are needed); 781 (stating that Plaintiff's mood improved "with working and feeling accomplished"); 789 (noting Plaintiff's improved mood, as well as her ability to ask for help from family); 806 (explaining Plaintiff's improvement in depression symptoms and goal to find new employment); 809 (reporting mild mental health symptoms and that she enjoys working); 812 (noting stable mood and improvement due to school and working); 822 (discussing Plaintiff's improved mood, online classes, new work-from-home job, and coping skills)). Then, in November 2021, Plaintiff was hospitalized due to suicidal ideations. (R. at 30, citing R. at 1022–76). Still, as ALJ Stanley noted, her depression "resolved" after receiving treatment, and she was discharged from the hospital. (R. at 30, citing R. at 1023 ("[Plaintiff's] mood improved and stabilized. The depression resolved.")).

ALJ Stanley then discussed that Plaintiff's mood and symptoms remained stable throughout 2022. For example, she reported no "nightmares, flashbacks, or hallucinations" after her discharge from the hospital. (R. at 30, citing R. at 1086 (reporting a better mood and that her

only concern "is some anticipatory anxiety")). ALJ Stanley also analyzed a mental status examination from 2022 where Plaintiff "had good impulse control, good insight, adequate judgment, normal speech, normal thoughts, normal motor activity, normal cognitive function, [and] normal insight." (*Id.*, citing R. at 1083–84). Finally, ALJ Stanley discussed that by May 2022, Plaintiff reported that she was "doing well," which was confirmed by another "normal" mental status consultative examination. (*Id.*, citing R. at 1152–54).

These cited records and others bolster ALJ Stanley's conclusion that Plaintiff's records show more "moderate" mental health symptoms that "wax and wane," rather than evidence of "marked and severe limitations." (R. at 31; *see, e.g.*, R. at 935 (reporting no symptoms of depression and stating Plaintiff "feels fine"), 943 (noting stable mood and only mild depression and anxiety), 945 (same), 947 (stating that while Plaintiff "today is depressed," her anxiety is "well-controlled"), 1003 (reporting only "moderate anxiety and mild depression"), 1086 (noting that Plaintiff is "feeling better now" three months post-hospitalization). Accordingly, his assessment that Ms. Martin's opinion is inconsistent with the record is supported by substantial evidence.

More still, ALJ Stanley properly evaluated the supportability of Ms. Martin's opinion as required by the regulations. *See* 20 C.F.R. § 404.1520c(c)(2). He found that her opinion provided "inadequate support, with no written explanation or citation to objective evidence." (R. at 31). Indeed, Ms. Martin did not provide written explanations for her conclusions on Plaintiff's abilities, and she did not cite any treatment records. (R. at 1166–71). Instead, Ms. Martin used a "check-box form." (R. at 31, citing R. at 1166–71). Courts have determined that ALJs properly discount opinions when sources use checklists and fail to provide explanations and citations to medical evidence; so too here. *See Tammy W. v. Comm'r of Soc. Sec.*, 2:22-cv-300, 2022 WL 3643604, at

*9 (S.D. Ohio Aug. 24, 2022) ("NP Adkins's opinion is in a checklist form, so the ALJ's contention that there is little narrative explanation of her restrictive opinion is correct."); *Melinda R. v. Comm'r of Soc. Sec.*, 2:21-cv-4095, 2022 WL 2734424, at *7 (S.D. Ohio July 14, 2022) (stating that courts throughout the Sixth Circuit have found checklist forms to be unsupported); *Hernandez v. Comm'r of Soc. Sec.*, 644 F. App'x 468, 474–75 (6th Cir. 2016) (finding a check box form to be "weak evidence at best" of a plaintiff's disability); *Zachariah G. v. Comm'r of Soc. Sec.*, 2:21-cv-1600, 2022 WL 883769, at *9 (S.D. Ohio Mar. 25, 2022) (affirming an ALJ's decision that a medical opinion was unpersuasive where the medical source used a checklist form); *Murray v. Comm'r of Soc. Sec.*, 2:21-cv-2078, 2021 WL 6063289, at *4 (S.D. Ohio Dec. 22, 2021) (citing cases throughout the country where opinions given through checklist forms were found to be unsupported).

In sum, ALJ Stanley considered Ms. Martin's opinion and evaluated it based on the record as a whole.  And the Undersigned agrees with his assessment that her opinion was at times inconsistent with the record, lacked citations to medical evidence, and provided little explanation for her conclusions.  While Plaintiff may wish that ALJ Stanley "had interpreted [this] evidence differently," this Court cannot reweigh evidence or substitute its judgment for that of ALJ Stanley. *Zachariah G.*, 2022 WL 883769, at *11 (internal citations and quotations omitted).  Accordingly, the Undersigned finds no error.

## B. The ALJ's Compliance with *Earley*

Plaintiff also contends that ALJ Stanley improperly applied principles of *res judicata* to her case when he examined the prior ALJ's decision.  (Doc. 10 at 13–17).  In *Drummond v. Commissioner of Social Security*, the Sixth Circuit held that "[w]hen the Commissioner has made a final decision concerning a claimant's entitlement to benefits, the Commissioner is bound by this

13

determination absent changed circumstances." 126 F.3d 837, 842 (6th Cir. 1997). In that case, the claimant's initial claim for SSI was denied when an ALJ found that she was capable of sedentary work. *Id.* at 838. When the claimant later re-filed her disability claim, a second ALJ found that she was capable of medium-level work—unlike the sedentary RFC finding of the first ALJ—and denied the re-filed claim. *Id.* at 839. After explaining that "[*r*]es judicata applies in an administrative law context following a trial type hearing," the Sixth Circuit held that the second ALJ was bound by the sedentary RFC determination of the first ALJ because there was no new or additional evidence of an improvement in the claimant's condition. *Id.* at 841–42. The Sixth Circuit reasoned that "[j]ust as a social security claimant is barred from relitigating an issue that has been previously determined, so is the Commissioner." *Id.* The Social Security Administration subsequently issued an Acquiescence Ruling explaining how the ruling in *Drummond* would be applied to claims in the Sixth Circuit:

> When adjudicating a subsequent disability claim with an unadjudicated period arising under the same title of the Act as the prior claim, adjudicators must adopt such a finding from the final decision by an ALJ or the Appeals Council on the prior claim in determining whether the claimant is disabled with respect to the unadjudicated period unless there is new and material evidence relating to such a finding….

AR 98-4(6), *Effect of Prior Findings on Adjudication of a Subsequent Disability Claim Arising Under the Same Title of the Social Security Act – Titles II and XVI of the Social Security Act*, 1998 WL 283902, at *3 (June 1, 1998).

Then, in *Earley v. Commissioner of Social Security,* the Sixth Circuit clarified how *res judicata* applies in social security proceedings. 893 F.3d 929 (6th Cir. 2018); *see also Teasley v. Comm'r of Soc. Sec.*, No. 2:18-cv-1079, 2019 WL 2559514, at *5 (S.D. Ohio June 21, 2019) (stating that *Earley* clarified the Court's decision in *Drummond*). If a claimant files an application covering the same period as an earlier application, *res judicata* applies absent changed

circumstances.  *Id.* at 933.  *Res judicata* does not apply if a claimant, like Plaintiff here, files a subsequent application seeking benefits for a different time period.  *Id.*  In those cases, the claimant is entitled for a "fresh review" of their application.  *Id.*  Yet the Court noted that "[f]resh review is not blind review."  *Id.* at 934.  The Court instructed that an ALJ may consider a prior ALJ's decision and that such consideration may lead to "consistent decision making."  *Id.*  If the current ALJ decides there is no new or material evidence in the claimant's record, they may treat the earlier decision as "legitimate, albeit nonbinding, consideration in reviewing a second application."  *Id.* at 933.

But an ALJ's erroneous citation to *Drummond* without reference to *Earley* does not necessarily warrant reversal.  *Christina S. v. Comm'r of Soc. Sec.*, No. 3:22-cv-298, 2023 WL 4557045, at *8 (S.D. Ohio July 17, 2023).  While citing the wrong legal standard may raise a "yellow flag," the ultimate question is "whether the [ALJ] gave a fresh review to the evidence" in a claimant's case.  *Mark D. v. Comm'r of Soc. Sec.*, No. 3:22-cv-58, 2023 WL 312795, at *5 (S.D. Ohio Jan. 19, 2023), *report and recommendation adopted*, No. 3:22-cv-58, 2023 WL 2479792 (S.D. Ohio Mar. 10, 2023) (citing *Mitchell v. Comm'r of Soc. Sec.*, No. 20-cv-13414, 2022 WL 165869, at *2 n.3 (E.D. Mich. Jan. 28, 2022)).  For example, discussing new medical records provides evidence that the ALJ freshly reviewed a claimant's case.  *Brandon M. v. Comm'r of Soc Sec.*, No. 3:22-cv-167, 2023 WL 6348406, at *3 (S.D. Ohio Sept. 29, 2023).

Moreover, adding severe impairments that were not included in a claimant's prior disability determination is also "a strong indicator that the current ALJ conducted a fresh look at the evidence."  *Id.*  (citing *Sadler v. Comm'r of Soc. Sec.*, No. 18-11689, 2019 WL 4892419, at *6 (E.D. Mich. Aug. 16, 2019)); *see also Dennis D. v. Comm'r of Soc. Sec.*, No. 3:22-cv-202, 2023 WL 2943822, at *8 (S.D. Ohio Apr. 14, 2023) ("Because ALJ Beatty reached a different

conclusion than ALJ Kenyon's prior decision. . . it is apparent that ALJ Beatty provided the fresh look to which plaintiff was entitled."), *report and recommendation adopted sub nom. Dennis D. v. Comm'r of Soc. Sec.*, No. 3:22-cv-00202, 2023 WL 3979215 (S.D. Ohio June 13, 2023).  At base, each decision must be examined on its own merit to determine whether the ALJ complied with the requirements of *Earley.  Christina S.*, 2023 WL 4557045, at *8

The Undersigned concludes that, based on his decision as a whole, ALJ Stanley gave Plaintiff's case the required fresh review.  In determining Plaintiff's RFC, ALJ Stanley discussed *Drummond* as follows:

> The undersigned has also fully considered and weighed the residual functional capacity from the prior Unfavorable Decision in accordance with Drummond v. Commissioner of Social Security, 126 F.3d 837 (6th Cir. 1997) and Acquiescence Ruling 98-4(6) (Exhibit B1A). At that time, [Plaintiff] was found capable of performing a range of light work, with additional postural, environmental, and mental limitations, despite her severe impairments of asthma, restless leg syndrome, hypertension, joint pain, fibromyalgia, obesity, borderline personality disorder, anxiety disorder, and affective disorder. (Exhibit B1A). Such decision was generally consistent with the objective medical evidence at the time it was determined, and it includes adequate support, with detailed explanation and analysis. The current record shows new and material evidence supportive of slightly greater mental limitations. As such, the prior residual functional capacity is accorded only partial weight for the current time period. However, to the extent that any previously stated evidentiary or other findings contained within the prior Unfavorable Decision remain uncontradicted and support the conclusions reached within the present determination, all are expressly incorporated by reference herein (Exhibit B1A). Indeed, while the current record supports various other/different severe impairments, the prior physical limitations remain adequate to fully accommodate [Plaintiff]'s overall physical condition.

(R. at 26).

> The state agency mental psychiatric review technique and residual functional capacity mental limitations are mostly persuasive (Exhibits B3A, B5A, B7A, and B9A). These consultants adopted the prior psychiatric review technique and mental limitations in accordance with Drummond v. Commissioner of Social Security, 126 F.3d 837 (6th Cir. 1997) and Acquiescence Ruling 98-4(6). While a range of no more than moderate mental limitations is consistent with [Plaintiff]'s diagnoses, treatment, and mental status examination findings, the undersigned finds that slightly greater mental limitations, as defied above, are more consistent with the

overall records, particularly given the evidence of a new/short hospitalization in November 2021.

(R. at 31).

Plaintiff argues that ALJ Stanley "found that he was bound by the prior ALJ's determination." (Doc. 10 at 13). But ALJ Stanley's own words show this argument is incorrect, because he never said he was mandated to follow the prior decision. Rather, he expressly said he only gave ALJ Gruenberg's decision "partial weight" due to new and material evidence in the record. (R. at 26). And even if ALJ Stanley gave some weight to the prior decision, as the Sixth Circuit has said, "a later administrative law judge may consider what an earlier judge did if for no other reason than to strive for consistent decision making." *Earley*, 893 F.3d at 933.

Still, ALJ Stanley added limitations that were not present in Plaintiff's previous RFC, which further demonstrates that he gave her case the required fresh look. *Brandon M.*, 2023 WL 6348406, at *3. For example, ALJ Stanley limited her to "no contact with the general public," whereas ALJ Gruenberg found that superficial contact with the public was appropriate. (*Compare* R. at 24 *with* R. at 99). ALJ Stanley also substantially modified the type of work Plaintiff should do, finding her capable of only "simple, routine, and repetitive tasks, requiring only simple decisions, with no fast-paced production requirements, such as assembly line work or piecemeal quotas." (R. at 24). This RFC is significantly more limited than the one created by ALJ Gruenberg, who found Plaintiff could do simple tasks on a sustained basis. (R. at 99). ALJ Stanley also set new limits on how Plaintiff can adapt to workplace change and the type of contacts she can have with coworkers and supervisors. (R. at 24, 99). Finally, ALJ Stanley also rejected ALJ Gruenberg's limitation to "work in a small familiar group" for one where Plaintiff should not work "in close coordination with others" and should instead be "working with things rather than people." (R. at 24, 99). Indeed, ALJ Stanley's own words are the best indicator that he gave the required

fresh look, as he said that he added these "greater mental limitations" due to "new and material evidence." (R. at 26); *Christina S.*, 2023 WL 4557045, at *7 (noting the ALJ's own words that said he was not bound by the prior ALJ's decision).

Further, ALJ Stanley thoroughly reviewed new evidence in crafting Plaintiff's RFC. Even though ALJ Stanley endorsed much of the previous decision's physical limitations, he did so because, based on his review of the record as a whole, "the prior physical limitations remain[ed] adequate to fully accommodate [Plaintiff's] overall physical condition." (R. at 26). For example, when reviewing a new diagnosis of diabetes mellitus, type II, ALJ Stanley noted that Plaintiff does not require insulin and "has no associated physical examination abnormalities." (*Id.*). After reviewing treatment records associated with this diagnosis, he found no additional limitations were needed because Plaintiff had not been hospitalized and had normal physical examination findings. (*Id.*, citing R. at 948, 952, 957, 962–63, 992–1000, 1009–1011, 1016, 1083–85, 1090, 1107–10, 1133–35).

ALJ Stanley also analyzed Plaintiff's back pain, finding that despite some pain and tenderness, she had a "normal gait" and "intact strength" in 2021. (R. at 27, citing R. at 992–1000). He also noted that later physical examinations confirmed these "normal" results, and imaging revealed "no significant lumbar findings and no evidence of radiculopathy, myopathy, or neuropathy." (*Id.*, citing R. at 1159, 1162). Then, he stated that although his decision was a "new assessment," "no further limitations [were] supported, as imaging findings are normal and physical examination show intact strength and gait." (R. at 27).

What's more, ALJ Stanley considered Plaintiff's vertigo, asthma, fibromyalgia, hypertension, and obesity. (R. at 27–28). ALJ Stanley explained that, over the years, these conditions appeared to be "well managed with oral medications with no evidence of any disabling

physical examination abnormalities." (*Id.*, citing 659–62, 663–66, 667–69, 670–73, 674–77, 678–82, 683–85, 686–90, 935–37, 940–42, 952–53, 962–63, 992–1000, 1009–12).  He also discussed that a 2021 physical showed "5/5 grip strength, 5/5 upper and lower extremity strength, a normal gait, intact reflexes, intact sensations, intact cranial nerves, and no mention of any fibromyalgia tender points."  (R. at 28, citing R. at 992–1000).  Therefore, based on the objective medical evidence available, he concluded that Plaintiff's "previous reduction to light work" with postural and environmental limitations was appropriate.  (*Id.*)

And as previously discussed, based on Plaintiff's new mental health records, ALJ Stanley added numerous limitations that were not included in the previous RFC.  These facts show he thoroughly reviewed all the evidence in the record and conducted a fresh assessment of Plaintiff's case.  *See Parsons v. Comm'r of Soc. Sec.*, No. 2:20-cv-2594, 2021 WL 1015910, at *7–8 (S.D. Ohio Mar. 17, 2021) (affirming where an ALJ detailed new evidence in the record and gave the previous RFC "some weight" while adding new limitations).  As such, Plaintiff's assignment of error is overruled.

### C.  Treatment of the State Agency Psychologists' Opinions

Similarly, although Plaintiff did not raise a separate assignment of error, she takes issue with ALJ Stanley's treatment of the state agency psychologists' opinions.  She argues that ALJ Stanley failed to comply with *Earley* because he "adopted the findings from the [state agency psychologists] who adopted the decision of the prior ALJ."  (Doc. 13 at 1–2; *see also* Doc. 10 at 16–17).

But again, while ALJ Stanley found their opinions consistent with the evidence provided and Plaintiff's diagnoses, he declined to adopt their findings.  (R. at 31).  Instead, he found that "slightly greater mental limitations" were warranted based on the "overall records" available and

Plaintiff's November 2021 hospitalization. (*Id.*). Plaintiff's argument is therefore misguided, as ALJ Stanley did not use their determinations as a "starting point" or adopt their findings wholesale. *Cf. Robert K. v. Comm'r of Soc. Sec.*, 3:22-cv-91, 2023 WL 5662785, at *6–7 (S.D. Ohio Sept. 1, 2023) (reversing where an ALJ discussed new medical evidence, but also stated that the opinions of the state agency psychologists were persuasive because "no evidence in the medical records substantiate [that] Plaintiff would require additional limitations from the previous decision"); *Anthony L. M. v. Comm'r of Soc. Sec.*, No. 3:20-cv-525, 2022 WL 10638159, at *3–4 (S.D. Ohio June 27, 2022) (finding error where the ALJ adopted the recommendations of state agency psychologists, which were the same as a prior mental RFC).

Rather, ALJ Stanley gave Plaintiff's mental health evidence the required fresh look and created a substantially different RFC than that recommended by the psychologists. For example, ALJ Gruenberg and the state agency psychologists limited Plaintiff "to simple tasks on a sustained basis," solo or small group work, and superficial contact with the public. (R. at 99, 125–26, 137, 146–47, 157–58). On the other hand, ALJ Stanley crafted the following mental RFC:

> [Plaintiff must be] limited to simple, routine, and repetitive tasks, requiring only simple decisions, with no fast-paced production requirements, such as assembly line work or piecemeal quotas; capable of adapting to changes in the work environment, meaning changes in work responsibilities or workplace, which are explained in advance of implementation and implemented gradually over time; can have occasional contact with coworkers and supervisors; can have no contact with the general public; and once work is assigned, it should be able to be performed without working in close coordination with others and generally, tasks should be require working with things rather than people.

(R. at 24).

Therefore, the Undersigned cannot fairly say that ALJ Stanley "used the prior ALJ decision as the starting point for his own analysis" of Plaintiff's mental health limitations. His consideration of new medical records and Plaintiff's 2021 hospitalization, as well as the more restrictive

limitations he added, show he reviewed the evidence independently without a thumb on the scale and crafted an appropriate RFC. (R. at 31); *see Tammy T. v. Comm'r of Soc. Sec.*, No. 1:22-cv-248, 2023 WL 3432299, at *6 (S.D. Ohio May 13, 2023) (affirming an ALJ's decision where the ALJ "based his conclusion on the medical evidence of record obtained after" the previous ALJ's decision").

While Plaintiff argues that evidence in the record "warranted a different finding and greater physical and psychological limitations," that is not for the Court to decide. (Doc. 10 at 16). ALJ Stanley's decision is supported by substantial evidence and is within his "zone of choice." *Felisky v. Bowen*, 35 F.3d 1027, 1035 (6th Cir. 1994). As a result, this Court affirms.

## IV. CONCLUSION

Based on the foregoing, it is **ORDERED** that Plaintiff's Statement of Errors (Doc. 10) is **OVERRULED** and that judgment be entered in favor of Defendant.

**IT IS SO ORDERED.**

Date: February 8, 2024          /s/ Kimberly A. Jolson
                                                 KIMBERLY A. JOLSON
                                                 UNITED STATES MAGISTRATE JUDGE